**SO ORDERED.**

**SIGNED this 27 day of March, 2009.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BOOT HILL BIOFUELS, LLC | ) | **Case No. 08-13128** |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on debtor-in-possession Boot Hill Biofuels, LLC's

application to employ the law firm of Stinson Morrison Hecker LLP as bankruptcy counsel in this

chapter 11 reorganization pursuant to 11 U.S.C. § 327(a).[1]  The United States Trustee and

petitioning creditor Biofuel Venture I, LLC object on grounds of conflict of interest,

---

[1] Dkt. 21.

-1-

disinterestedness and proposed retroactive effect of the employment.[2] The Court convened an evidentiary hearing on February 18, 2009 and took the application under advisement upon closing the record.[3] Debtor appeared by Paul Hoffmann and Scot Hill of Stinson Morrison Hecker, Kansas City, Missouri. Biofuel Venture I appeared by its attorneys David Jones of Amarillo, Texas and David Arst of Wichita, Kansas. The United States Trustee appeared by William Schantz.

<u>Jurisdiction</u>

A debtor-in-possession's application to employ chapter 11 counsel under 11 U.S.C. § 327 is a core proceeding over which this Court has subject matter jurisdiction.[4]

<u>Factual Background</u>

I. <u>The Employment Application</u>

This bankruptcy case was commenced as an involuntary chapter 7 petition on December 1, 2008 by Biofuel Venture I ("BVI"), the petitioning creditor. On December 22, 2008, debtor Boot Hill Biofuels LLC ("Debtor"), by SMH, moved to convert the case to a voluntary chapter 11; the motion was granted and an order converting the case was entered December 23, 2008. Debtor was ordered to file its schedules within fifteen (15) days, or by January 9, 2009. Debtor, by SMH, filed its schedules on January 8, 2009. On January 15, 2009, Debtor filed its motion to employ Stinson Morrison Hecker LLP ("SMH") as Debtor's counsel *nunc pro tunc* to December 1, 2008, the date of the involuntary petition (the "Application").[5] SMH requested, and the Court granted an expedited

---

[2]  Dkt. 31 and 33.

[3]  All exhibits were admitted by stipulation of counsel.

[4]  28 U.S.C. § 157(b)(1) and (2)(A) and (O) and § 1334.

[5]  Dkt. 21. *See* 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014(a).

-2-

hearing on the Application. On January 23, 2009 the § 341 meeting was held; Jack Marvin, an attorney with SMH in its Wichita office, appeared for Debtor at the meeting. In the interim, BVI filed a motion to convert the case back to chapter 7 for cause, contending that there was no reasonable likelihood of rehabilitation, loss to or diminution of the estate, and the absence of an application to employ Debtor's counsel.[6] BVI's motion has been set to a scheduling conference on March 19, 2009.

In the Application, SMH disclosed that it was holding a $10,000 retainer from Debtor for services to be performed in connection with the bankruptcy case. According to the Statement of Financial Affairs, SMH received the retainer on December 22, 2008. SMH's proposed representation of Debtor includes "[r]epresentation in all phases of the bankruptcy proceedings" and "[p]erformance of all other legal services" necessary for administration of the case and Debtor's reorganization. SMH also disclosed its prior connections with Debtor's creditors or other parties-in-interest, including ongoing, unrelated representation of (1) Debtor's accountant, Kennedy & Coe ("Kennedy"); (2) Debtor's management company and an equity holder, Conestoga Energy Partners ("Conestoga"); and (3) individual interest owners of Third Day Biofuels, LLC, an equity holder and a noteholder of Debtor. Conestoga controls the Debtor board of directors, having the power to appoint two directors and exercise 51% of the voting power of the Board.

SMH also disclosed that it first represented Debtor in late July of 2008. In connection with that representation, SMH billed fees and expenses of $24,134.50. Pursuant to a letter agreement between Debtor and BVI, BVI paid those fees and expenses on behalf of Debtor. BVI is not related or affiliated with Debtor, but is a general unsecured creditor with a claim of $750,000. SMH left

---

[6] Dkt. 19. *See* 11 U.S.C. § 1112(b)(4)(A).

open whether BVI would be paying the fees and expenses incurred by SMH in its bankruptcy representation of Debtor:

> Whether [BVI] is obligated to pay, or will pay, any legal fees or expenses of SMH after the filing of the involuntary Petition has not been determined.[7]

The United States Trustee objected to Debtor's employment of SMH under § 327(a) suggesting that the disclosed conflicts results in SMH not being disinterested or having an interest adverse to the estate.[8] BVI joined in the UST's objection contending that SMH's previous representation of creditors of Debtor presents a disqualifying conflict of interest, that SMH is not disinterested, and that *nunc pro tunc* employment in any event should not be approved absent a showing of extraordinary circumstances.[9]

At the March 19, 2009 status conference, the parties announced that a "global" resolution of their differences had been reached and that both BVI and the Trustee were willing to withdraw their objections to SMH's employment Application. Under the proposed resolution, an offer in compromise will be noticed to all creditors providing for a restructuring of the debt and equity of Boot Hill in the context of a chapter 11 plan. The withdrawal of the parties' objections to SMH's Application in no way minimizes this Court's independent duty to determine whether SMH is legally eligible to represent the debtor in possession under § 327.[10]

## II. The Players

Debtor is a Kansas limited liability company that was formed for the purpose of constructing

---

[7] Dkt. 21, Exhibit A, ¶ 3.d. (Declaration of SMH attorney, Paul M. Hoffmann).

[8] Dkt. 31.

[9] Dkt. 33.

[10] *In re Interwest Business Equipment, Inc.,* 23 F.3d 311, 317 (10th Cir. 1994).

-4-

an ethanol plant near Dodge City, Kansas. Gary Harshbarger has been Debtor's president since its inception in August of 2006.[11] He has overseen the attempted construction of the ethanol plant and the raising of capital. When Debtor was organized it raised approximately $1.6 million in capital, mostly through western Kansas investors.[12]

SMH was not involved with, nor represented Debtor, at this time. Scot Hill, an attorney with SMH was involved with other ethanol plants in his transactional law practice and sat on the board of directors of other ethanol plants or ethanol-related industries.[13] According to Harshbarger, a local attorney provided legal services to Debtor during this start-up phase. Local counsel assisted Debtor with conditional use permits for the ethanol plant. Hill testified that he chaired the corporate counsel department of SMH; he described himself as a transactional lawyer, devoting much of his law practice to mergers and acquisitions. He also represented biofuel companies and related operators. Among SMH's clients is Conestoga. Hill first provided legal services to Conestoga in early 2007 and is the principal attorney at SMH that represents Conestoga. Since that time, Hill continues to provide legal services to Conestoga, mostly handling contract matters between Conestoga and other third parties that are unrelated to Debtor. Hill was unaware of Conestoga's interest in Debtor until July of 2008. As discussed later in this opinion, SMH was first retained to represent Debtor in 2008, for more complicated matters that its local counsel was not comfortable handling.

Biofuel Venture I, LLC ("BVI") was not one of Debtor's equity investors, but an individual

---

[11] Harshbarger owns 15 membership units in Debtor.

[12] Many of these investors have interests in other ethanol plants in Kansas, one in Garden City (Bonanza) and one in Liberal (Arkala).

[13] It was through these industry connections that Hill became acquainted with Harshbarger and Debtor. Hill represented Conestoga Energy Partners, L.L.C. which was the managing entity of the Bonanza and Arkala ethanol plants in southwest Kansas.

by the name of Thomas Kent was.[14]  Kent is a lawyer in California.  He is the Vice President of BVI, a California limited liability company located in Los Angeles.  Howard Nilsen is the chief financial officer of BVI.  BVI holds a construction slot note in the amount of $750,000 and is an unsecured creditor of Debtor, as described below.

Another of Debtor's equity investors was Conestoga Energy Partners ("Conestoga").[15]  It was described as a management company for Debtor, having been involved in the construction of the Bonanza and Arkala ethanol plants and the managing entity of those plants as well.  Conestoga controls the board of directors of Debtor, having the power to appoint two directors to exercise 51% of the voting power.  Harshbarger referenced some form of contract or agreement entered into between Debtor and Conestoga for development and accounting services, although that agreement is not a part of the record before the Court.  It is unclear when that contract was entered into, but it appears that Conestoga continues to provide management or accounting services of some type to Debtor.  Since the ethanol plant has not been constructed, Debtor does not have a "physical address" and uses Conestoga's address for receipt of mail.

Another entity known as Third Day Biofuels, LLC ("Third Day") is an equity interest owner of Debtor, holding 12 units.  According to the Application, SMH represents individual interest owners of Third Day, the identities of which are not disclosed.  In addition to its equity investment, Third Day is the holder of a $400,000 construction slot note, and an unsecured creditor of Debtor, described below.

In addition to the equity investments, Harshbarger testified that ethanol plants are financed

---

[14]  *See* Dkt. 13, List of Equity Security Holders.  Kent owned 2 units in Debtor.

[15]  Conestoga owned 1 unit in Debtor.  *See* Dkt. 13.

Case 08-13128    Doc# 46    Filed 03/27/09    Page 6 of 27

through construction slot agreements and notes. These agreements are so named because ethanol plant are built according to when they can fit into a "construction slot." ICM, Inc. is an entity located in Colwich, Kansas that is involved in constructing ethanol plants. Harshbarger described ICM as the "engineering company" for the proposed ethanol plant. Debtor and ICM entered into a slot agreement. Under the slot agreement, three installments of $2 million each were payable by Debtor to ICM.[16] Debtor paid the first $2 million up front to ICM. The construction orders for ethanol plants tend to have long lead items for the equipment and materials necessary to build the plant and require deposits. Debtor borrowed this $2 million from ICM at 15 per cent interest.[17] In exchange, ICM held a convertible note for this amount and could convert the note into an equity interest after the ethanol plant was built.

The second installment of $2 million was accomplished with proceeds from construction slot notes. In November 2006, Debtor issued ten slot notes to additional "investors," the repayment of which was due by July of 2007.[18] BVI was the holder of a slot note in the amount of $750,000. These slot note holders comprise the list of creditors holding the 20 largest unsecured claims and total $4 million dollars.[19] Other slot note holders included ICM ($2 million) and Third Day ($400,000).

Harshbarger testified that during 2007, prior to the downturn in the economy, the ethanol

---

[16] The Court does not have the benefit of the construction slot agreement in the record before it.

[17] ICM effectively contributed the first $2 million under the slot agreement.

[18] These ten slot notes were in addition to ICM, which also held a construction slot note in the amount of $2 million. *See* Dkt. 12.

[19] Dkt. 12.

environment was changing. As a result of these economic forces, available equity and debt began to "dry up." Debtor was unable to pay off the slot note holders in July of 2007.[20] It is unclear what transpired over the course of 2007, but suffice it to say, commencement of construction on the Debtor's ethanol plant was delayed while it attempted to sort through its financial problems or raise additional capital to fund construction. It appears that the third $2 million installment under the ICM slot agreement has never been funded.

III.  The EB-5 Immigration Program and Letter of Intent

By the summer of 2008, at least one slot note holder, BVI, was becoming increasingly concerned about its investment with Debtor and the status of the Boot Hill ethanol plant. It appears that BVI funded its $750,000 slot note through "immigrant investors" and the completion of the ethanol plant project was subject to certain time constraints in order for the investors to receive certain immigration benefits under a program known as the EB-5 Immigration Investment Program. Thomas Kent, on behalf of BVI and its investor-clients, sent a demand letter to Debtor in early June of 2008, seeking repayment of the BVI $750,000 slot note and transfer of their investments to "another" project, thereby extending the time to comply with the EB-5 Program requirements.[21]

The evidence presented on the EB-5 Immigration Investment Program was sketchy at best. Neither Debtor (Harshbarger) nor Hill had working knowledge of the EB-5 Program. Debtor was not associated with the EB-5 Program other than the BVI investors' use of the Boot Hill name and project to qualify their investment under the EB-5 program requirements. From the exhibits introduced into evidence, Kent (BVI) appeared to have the most knowledge or information about

---

[20] It appears that Debtor obtained a one-year extension, to July of 2008, on the slot notes.

[21] Ex. 1.

the Program, but he did not attend or testify at the evidentiary hearing. His absence was curious.

From what the Court can discern from its own cursory research into the EB-5 Program, immigrant investors in a commercial enterprise receive certain immigration benefits in exchange for their capital investment and the creation of jobs by the enterprise.[22] If the immigrant investor meets the capitalization and job creation criteria under the program, the alien investor may qualify for permanent lawful residence in the United States. The EB-5 program derives its name from the statute that establishes immigrant investors as the fifth preference in the "employment-based" visa preference category.[23] Apparently, these immigrant investors are subject to certain time constraints to demonstrate that the business is up and running and has generated a certain number of jobs.

In the case at bar, when the Boot Hill ethanol plant project stalled, Kent advised Debtor that the Boot Hill project must be merged into an alternate project and sought to utilize the Boot Hill project name to effectuate the merger, transfer BVI's investment, and preserve the immigration benefits under the EB-5 program.[24] Kent further advised that his law firm would perform (or cooperate with Debtor's counsel) the requisite legal services to accomplish this end. A second letter was sent by Kent on July 15, 2008 again demanding repayment of the BVI slot note and use of the Boot Hill project name to effectuate a merger and transfer of the BVI investment.[25] In this letter,

---

[22] The EB-5 program was enacted in 1990 as part of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5). *See also,* 8 U.S.C. § 1186b; 8 C.F.R. § 204.6. *See generally, R.L. Investment Ltd. Partners v. I.N.S.,* 86 F. Supp. 2d 1014, 1016-17 (D. Hawaii 2000), *aff'd* 273 F.3d 847 (9th Cir. 2001) and *Spencer Enterprises, Inc. v. United States,* 345 F.3d 683, 686 (9th Cir. 2003) for a description and discussion of the EB-5 program.

[23] *R.L. Investment Ltd. Partners, supra* at 1016-17.

[24] Ex. 1.

[25] Ex. 2.

-9-

BVI offered to indemnify the Debtor board and members from any potential future liability. The undercurrent from these communications and negotiations is that in exchange for an extension of the repayment of BVI's slot note, Debtor would agree to the restructuring to accommodate BVI's need to comply with the EB-5 program requirements.[26]

It was at this point that Harshbarger contacted Hill and engaged SMH to represent Debtor in conjunction with BVI's and Kent's restructuring request.[27] SMH's billing statements reflect that it first provided legal services to Debtor in conjunction with this transaction on July 29, 2008.[28] Hill testified that he believed SMH was representing only the Debtor in the transaction, not the other slot note holders. Harshbarger testified that Kent was representing BVI. It was proposed that the original entity, Boot Hill Biofuels, LLC (BH I) would be a "shell" entity to deal with BVI's immigration issue. BVI would own BH I. A new entity would be formed, BH II, and all of the existing assets and liabilities of BH I would be transferred to BH II. According to Harshbarger, the Debtor's Board was adamant that the restructuring would not cost Debtor's investors any money and it could not be injurious to Debtor.

On or about August 19, 2008, BVI and Debtor entered into a letter of intent (LOI) setting forth the proposed terms of the restructuring and transfer to accomplish BVI's request.[29] Paragraph 8 of the LOI provides:

BVI will pay when due all legal fees and costs incurred by Boot Hill and Boot Hill

---

[26] In addition, there apparently was the threat of involuntary bankruptcy.

[27] Harshbarger testified that when he contacted Scot Hill he knew that SMH represented Conestoga. He saw no conflict in SMH representing both Conestoga and Debtor.

[28] Ex. B-4.

[29] Ex. 3.

II in connection with the transactions contemplated by this letter of intent, including fees and costs associated with drafting, reviewing, and finalizing the various agreements contemplated by this letter of intent. Within five days of the date of this letter of intent, BVI will deliver $15,000 to Boot Hill's legal counsel as an initial retainer to be held by Boot Hill's legal counsel to cover legal fees and costs. This retainer will be replaced by BVI, if and as needed.

Paragraph 8 was binding upon the parties, even if negotiations terminated. Under paragraph 3 of the LOI, the slot note holders would agree to forbear on the slot notes for a period of one year. Kent signed the LOI as Vice President of BVI and Harshbarger signed as president of Debtor.[30] On or about August 27, 2008, BVI sent the $15,000 retainer to SMH as referenced in the LOI.[31]

After the LOI was executed, the necessary documents were prepared by SMH for execution.[32] Debtor sought its investors' and slot note holders' written consent to transfer Debtor's assets and liabilities to the new entity, BH II.[33] At some point in November, after the documents had been sent to the slot note holders and investors for signature, some of them resisted and refused to sign the consents, believing that BVI should pay value for BH I.[34] Hill attempted to explain the transactions to the slot note holders and the investors and secure their consent, but the restructuring transaction stalled.[35]

_____

[30] The original LOI was signed by Kansas Biofuel Venture I, LLC. The parties subsequently substituted Biofuel Venture I, LLC. *See* Ex. 4.

[31] Ex. A-1.

[32] According to Hill, Kent requested that SMH prepare the documents.

[33] *See* Ex. D-1, D-2, D-3, D-4, D-5, and D-6 for the documents and consents prepared by SMH for execution by the slot note holders and investors in Debtor.

[34] Ex. 8.

[35] It is apparent from Hill's testimony that he had some interaction and communication with the other slot note holders to secure their consent to the restructuring, although in the Court's view, these discussions did not rise to the level of SMH representing the interests of the

-11-

IV.    BH Reddwerks, LLC

On November 13, 2008, when the consents were not forthcoming and the deadline for the immigration credits about to expire at the end of November, BVI (by Kent) proposed an alternative structure.[36]  Under this proposal, a new entity called BH Reddwerks, LLC would be set up as a subsidiary of Debtor.  It would employee the minimum 10 employees required by the EB-5 Program. Debtor would own 51% of BH Reddwerks and an already existing entity, Reddwerks, would own 49% of BH Reddwerks.  BVI would fund BH Reddwerks' payroll and employee-related expenses and all costs associated with BH Reddwerks' formation.[37]  It appears that the BH Reddwerks structure was designed as a stop-gap measure to "buy time" while Debtor concluded its slot agreement with ICM and obtained consents from all its investors.

That same day, Kent filed Articles of Organization for BH Reddwerks, LLC with the Kansas Secretary of State and notified Harshbarger and Hill of the filing.[38]  Hill advised Kent that he wanted to review a draft of the anticipated operating agreement for BH Reddwerks; Kent was to prepare the operating agreement.[39]  Hill prepared a consent for the Debtor's Board to sign, authorizing BH Reddwerks, but withheld it from distribution pending his review of the draft operating agreement.[40] On November 20, 2008 Kent had Nilsen send a document titled "joint venture agreement" to Hill

---

other slot note holders.

[36]  Ex. 9.

[37]  Debtor wanted no liabilities associated with BH Reddwerks.

[38]  Ex. 10.

[39]  Ex. 11.

[40]  Ex. 13, 15 and 16.

for his review.[41] Hill reviewed and made changes to the joint venture agreement, returning it to Kent

on December 1, 2008, as an operating agreement.[42] That same day, Nilsen advised Hill and Debtor

that Reddwerks' counsel had previously revised the draft operating agreement for BH Reddwerks

sent out earlier.[43] Hill and Debtor further learned that this revised operating agreement had already

been executed (without Debtor's consent) and that BH Reddwerks had already paid the employee

payroll.[44] Howard Nilsen executed the BH Reddwerks operating agreement on behalf of Debtor,

even though Nilsen was not authorized to sign the operating agreement on behalf of Debtor and was

not an officer or member of Debtor.[45] Hill, on behalf of Debtor, immediately demanded that

Reddwerks be notified that the operating agreement was ineffective. On December 4, 2008,

Nilsen/BVI so notified Reddwerks, indicating that approval of the operating agreement by Debtor's

Board was required.[46]

V.     The Involuntary Bankruptcy

In the interim while BVI and Debtor were attempting to finalize an operating agreement for

BH Reddwerks, on November 21, BVI, through Kent, made written demand upon Debtor for

payment of its slot note; BVI advised that it was withdrawing its consent to the waiver agreement

---

[41] Ex. 18.

[42] Ex. 22.

[43] Ex. 23.

[44] Ex. 25.

[45] Ex. 26. Nilsen acted as the chief financial officer for BVI, not Debtor. *See* Ex. A-1 where Nilsen, as CFO of BVI, authorized BVI's payment of the $15,000 retainer to SMH under the LOI.

[46] Ex. 33.

-13-

on its slot note because other slot note holders had refused to execute such consents and the Debtor's members had refused to consent to the BH II restructuring.[47]   Apparently, some slot note holders refused to consent to the restructuring unless BVI waived payment of the $750,000 due BVI under its slot note with Debtor.[48]  On November 24, Kent advised Debtor and Hill that BVI had retained counsel and would be filing an involuntary bankruptcy petition.[49]  A week later, on December 1, 2008, BVI filed an involuntary bankruptcy petition against Debtor.  Pursuant to their agreement in the LOI, BVI has paid Debtor's attorney fees and costs incurred by SMH from August through November, 2008 in connection with the restructuring transaction in the approximate amount of $24,000.[50]  On December 22, 2008, SMH filed a motion to convert Debtor's bankruptcy case to one under chapter 11.  An order converting the bankruptcy case was entered on December 23, 2008. Thereafter, SMH filed schedules on behalf of Debtor and on January 15, 2009 Debtor filed its Application to employ SMH.

Upon the filing of the involuntary bankruptcy, BVI considered the LOI terminated and itself relieved of its obligation to pay any further legal fees of Debtor/SMH as of December 1, 2008.[51]  At that point, BVI and Debtor entered into discussions and negotiations regarding their options to salvage the "restructuring transaction," revision of the letter agreement, and BVI's responsibility

---

[47]  Ex. 20.

[48]  Ex. 21.

[49]  *Id.*

[50]  Ex. 5, 6, 7 and 30 (August through November 2008 billing statements of SMH).  There appears to be no dispute that BVI has fulfilled its fees obligation to Debtor/SMH under the LOI, having paid in full SMH's fees and expenses incurred up to December, when the restructuring transaction was deemed "dead."

[51]  Ex. E-14.

-14-

for SMH's fees going forward from December 1, including SMH's fees incurred in representing Debtor in the bankruptcy.[52] SMH's attorney fees for the month of December, 2008 were approximately $20,000 and its fees for the month of January, 2009 were approximately $25,000.[53] The negotiations did not yield a firm agreement and with the case in this posture, the Debtor's Application to employ SMH as bankruptcy counsel came on for evidentiary hearing.[54]

Hill testified concerning SMH's representation of, or connection to, three parties disclosed in the Application: Kennedy & Coe, Conestoga, and Third Day Biofuels. Kennedy & Coe is Debtor's accountant. SMH previously handled a matter for Kennedy & Coe that its general counsel was unable to handle due to a conflict. SMH's representation was unrelated to the Boot Hill project. Hill believes SMH has billed $13,000 in fees in connection with that matter and that $1,000-$2,000 was paid to SMH in 2008.[55]

Third Day is an equity investor, holding 12 units in Debtor, and is also an unsecured creditor holding a slot note in the amount of $400,000. SMH has not represented Third Day. One of Third Day's equity owners is Jon Burrell. SMH represents Garmin, an entity affiliated with Burrell. Hill stated that the representation of Garmin did not involve or relate to Debtor or the Boot Hill project. SMH presently represents Garmin in unrelated matters.

---

[52] Ex. E-17, Ex. E-19, Ex. F-1, Ex. F-2.

[53] Ex. E-19. It is unclear whether all of these fees were incurred for SMH's services in connection with the bankruptcy representation.

[54] It is apparent that while the bankruptcy case has proceeded forward, BVI and Debtor continue to negotiate for the potential of BVI paying SMH's attorney fees incurred by Debtor after December 1, 2008. It is equally clear that as of the date of the evidentiary hearing, BVI has not committed to indemnify Debtor for its attorney fees.

[55] According to the Statement of Financial Affairs, Debtor paid $3,000 to Kennedy & Coe on December 22, 2008.

-15-

Conestoga is an equity investor in Debtor. It holds 1 unit and has power to appoint two directors of Debtor, who in turn exercise 51% of the voting power of Debtor's board. Conestoga is Debtor's management company. It is unclear whether Conestoga's equity investment and power on the Board is in exchange for Conestoga's providing management services to Debtor, or whether Debtor pays some other financial remuneration for Conestoga's services. Hill testified that SMH represents Conestoga on contractual matters with third parties (not Debtor). Its representation of Conestoga is unrelated to Debtor or the Boot Hill project. SMH received approximately $30,000 in fees paid by Conestoga in 2008 related to this representation.

As SMH stated at the hearing, this is not a complex case; it involves few assets and few creditors. Debtor's schedules and statements reflect that this chapter 11 involves eleven unsecured creditors holding slot notes (including BVI) in the total amount of $4 million ($750,000 held by BVI). Debtor owns funds in accounts totaling $498,056 and some personal property of unknown value. Debtor's only source of income is interest income. No secured creditors or unsecured priority claims are reported. Construction of the ethanol plant has not commenced. SMH is not listed as a creditor of Debtor even though some $20,000 in attorney fees were incurred after the December 1 petition date during December of 2008.

Analysis

This Application presents conflict of interest and disinterestedness issues on the part of SMH. The Court considers the Application under 11 U.S.C. § 327, which provides in relevant part:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

* * *

-16-

(c) In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment or representation of a creditor unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

The phrase "hold or represent an interest adverse to the estate" in § 327(a) is not defined by the statute but some courts have adopted the following definition:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under the circumstances that render such a bias against the estate.[56]

SMH is disinterested within the meaning of § 101(14) if it:

(A) is not a creditor, an equity security holder, or an insider;
(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holder, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

Only subsections (A) and (C) are implicated here. An actual conflict of interest exists in the context of the disinterestedness requirement if there is an active competition between two interests, in which one interest can only be served at the expense of the other.[57] Whether or not the Trustee or BVI objects, this Court can only approve employment of professionals meeting these minimum requirements.[58]

I.     SMH's Alleged Pre-Petition Representation of BVI

The Court is firmly convinced from the evidence adduced at the hearing that SMH has no

_____

[56] *In re Roberts,* 46 B.R. 815, 827 (Bankr. D. Utah 1985), *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D. Utah. 1987).

[57] *In re Git-N-Go, Inc.*, 321 B.R. 54, 58 (Bankr. N.D. Okla. 2004).

[58] *In re Interwest Business Equipment, Inc.,* 23 F.3d 311, 317 (10th Cir. 1994).

-17-

attorney-client relationship with BVI and did not represent BVI's interest in the restructuring transaction. Notwithstanding BVI's alleged "belief" that SMH was representing it in the restructuring transaction, the LOI dispels any such notion. BVI's obligation to pay for Boot Hill's legal costs to carry out the restructuring clearly refers to "Boot Hill's legal counsel," not BVI's legal counsel or the parties' legal counsel.[59] It was Debtor, not BVI, that contacted SMH and retained its legal services relative to the LOI and restructuring. BVI has come forward with no evidence to refute Harshbarger's and Hill's testimony concerning the events leading up to Debtor hiring SMH in the summer of 2008. It is clear to the Court that Debtor, as an accommodation to BVI's need to comply with the EB-5 Program, went along with the restructuring proposal. Debtor made clear, however, that it would not be out-of-pocket any costs or expenses associated with BVI's request, nor incur any liability as a result of the restructuring.[60] The Court concludes that SMH did not represent BVI pre-petition and therefore, SMH did not represent BVI, one of Debtor's creditors, and has no conflict of interest under § 327(c).[61]

BVI's funding of Debtor's pre-petition legal fees to effectuate the LOI and restructuring stands on slightly different footing. Even though § 327(c) may not be implicated, SMH must still satisfy the requirements of § 327(a). The question becomes whether SMH holds an interest adverse to the estate or is disinterested by reason of BVI's funding of SMH's pre-petition attorney fees under the LOI. The Court expressly finds that BVI's obligation to pay SMH's attorney fees for the

---

[59] Ex. 3, ¶ 8.

[60] Ex. 3, ¶¶ 6-8.

[61] *In re Glenn Electric Sales Corp.,* 89 B.R. 410, 415 (Bankr. N.J.), *aff'd* 99 B.R. 596 (D.N.J. 1988) (Debtor's sole shareholder's payment of counsel's retainer does not equate to representation of the shareholder). As the bankruptcy court noted in *Glenn*, third party payment to a lawyer to represent a different person is not uncommon. 89 B.R. at 416.

-18-

restructuring transaction was discharged on the date of the involuntary petition. It is undisputed that BVI fully paid the pre-petition LOI attorney fees incurred August through November and no obligation to pay Debtor's legal fees under the LOI remains outstanding. At the point BVI filed the involuntary petition, the LOI was effectively terminated. These facts are distinguishable from the cases cited by SMH.[62] This is not a situation where a third party is paying the debtor's counsel's attorney fees *in the chapter 11 bankruptcy,* a situation that may or may not preclude employment.[63]

Under the circumstances here, the Court concludes that SMH is disinterested and holds or represents no interest adverse to the estate, by reason of BVI's funding SMH's pre-petition attorney fees pursuant to the LOI agreement, particularly where SMH has fully disclosed BVI's pre-petition compensation of SMH in the amount of $24,134.50 and makes no claim that BVI is still indebted to it under the LOI.[64]

II.     SMH's Representation of Conestoga and Kennedy & Coe[65]

---

[62]  *See In re Missouri Min., Inc.*, 186 B.R. 946 (Bankr. W.D. Mo. 1995) (chapter 11 debtor's principal who was also a creditor, advanced $15,000 retainer to counsel for filing of bankruptcy); *In re Lan Dan Enterprises, Inc.,* 221 B.R. 93 (Bankr. S.D.N.Y. 1998) (law firm that was compensated from debtor's principal was not precluded from being employed as special counsel in chapter 11 debtor's landlord-tenant dispute).

[63]  Some courts hold that third party payment of attorney fees of debtor's counsel does not disqualify counsel *per se* from employment. *See e.g., In re Missouri Min., Inc., supra; In re Kelton Motors, Inc.*, 109 B.R. 641, 657-58 (Bankr. D. Vt. 1989) (refusing to extend § 327(a) disinterested standard to an attorney paid by an insider-interested party to represent the debtor and citing conditions that should guide the court's determination); *In re Olson*, 36 B.R. 74 (D. Neb. 1983) (articulating four factors to determine whether a third party's payment of debtor's counsel is a basis for disqualification).

[64]  Dkt. 21, Exhibit A.

[65]  From the evidence produced at the hearing, no representation of creditor Third Day Biofuels by SMH was shown. The remote connection to Third Day, by SMH's representation of one of its owners and/or Garmin is insufficient in the absence of any evidence that SMH's representation was in any way related to the Boot Hill ethanol plant project or posed a conflict of

The Court next addresses whether SMH's former and/or ongoing representation of Kennedy & Coe and Conestoga on matters unrelated to the Boot Hill ethanol plant project disqualifies SMH from employment as Debtor's bankruptcy council. From the testimony presented at the hearing, SMH's representation of Kennedy & Coe was limited to a previous single matter that Kennedy & Coe's general counsel was unable to handle due to a conflict. The matter in question was unrelated to Boot Hill, the LOI, or the bankruptcy. Kennedy & Coe is not a creditor, equity security holder, or an insider of Debtor. It has served as Debtor's accountant. Under these circumstances, the Court concludes that SMH's previous representation of Kennedy & Coe on an unrelated matter is not adverse to the estate and does not make SMH not disinterested. SMH is not disqualified from employment be reason of its previous representation of Kennedy & Coe.

This leaves Conestoga. Conestoga is an equity security holder, holding a 1 unit membership in Debtor, and is the managing entity of Debtor. Perhaps more significantly, Conestoga controls the the Board of Directors of Debtor by its control of two board positions having 51% voting power. SMH represents Conestoga on an ongoing basis. Hill testified that this representation involves review or drafting of contracts between Conestoga and third parties. SMH's representation of Conestoga does not relate to the Boot Hill ethanol project. The question is whether SMH's dual representation of Conestoga and Debtor offends the adverse interest and disinterestedness requirements of § 327(a).

Conestoga controls the Debtor's Board because it has the ability to designate two members that would control 51% of the voting power. In addition, Conestoga's status as the managing company for Debtor indicates it wields considerable influence and control over Debtor. A person

interest or an interest adverse to the estate.

who is a director or managing agent of the debtor is an "insider."[66] SMH in essence, represents both the insider, Conestoga, and the Debtor, albeit not in this controversy. This fact places SMH's disinterestedness in doubt.[67] Subsection (C) of the disinterested definition is a catch-all clause that is broad enough to exclude employment of an attorney with some relationship that may color the attorney's independence and impartiality required by the Bankruptcy Code.[68]

While SMH's representation of Conestoga on unrelated matters may not be representation of an interest adverse to the estate, its representation of Conestoga has the *potential* to become adverse, and an actual conflict of interest, if for instance, Conestoga's management of Debtor is called into question, a contract dispute arises over Conestoga' management services provided to Debtor, or the member interests of Debtor are adverse to the estate. Such a representation would be a conflict of interest under Rule 1.7(a)(2) of the Kansas Rules of Professional Conduct ("KRPC"). That Rule provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: . . . (2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another

---

[66] 11 U.S.C. § 101(31)(B) and (F). *In re Interwest Business Equipment, Inc.*, 23 F.3d 311, 316-318 (10th Cir. 1994) (proposed employment of law firm to represent three interelated debtors with inter-company debts and where one of the debtors Retail Systems, Inc. had a management contract to manage debtor Green Street; Retail was an insider of Green Street)

[67] *In re EWC, Inc.*, 138 B.R. 276 (Bankr. W.D. Okla. 1992) (attorney for closely held family corporation [debtor in possession] that concurrently represented debtor's sole shareholder in divorce action, was not disinterested where impropriety and mismanagement of the debtor by shareholder was alleged).

[68] *See In re Cook*, 223 B.R. 782, 789 (10th Cir. BAP 1988) (Discussing the disinterested requirement under former subsection (E) of § 101(14), now codified as subsection (C)); *In re Git-N-Go, Inc.*, 321 B.R. 54 (Bankr. N.D. Okla. 2004).

client, a former client . . .[69]

KRPC 1.13(e) permits a lawyer to concurrently represent a limited liability company and any of its directors, members or other constituents, but such dual representation is subject to Rule 1.7. Here, it appears that SMH's recent dealings with Conestoga are unrelated to its representation of and duties to Boot Hill, but the Court must still determine whether there is a "substantial risk" that the Conestoga representation might materially limit SMH's representation of the Debtor. As the Tenth Circuit stated in *Interwest*, debtors' counsel must cast a "jaundiced eye and scowling mien" over all of the debtor's transactions without compromising its undivided loyalty to the debtor and estate.[70]

In this case, however, it appears unlikely that such a conflict will arise. Both BVI and the United States Trustee have indicated a desire to withdraw their objections to SMH's employment. Moreover, the parties have announced a settlement of the substantive differences in the case and state that an amended plan and disclosure statement will shortly be proposed that restructures the debtor's business and effectively treats BVI's claims. This Court acknowledges the Tenth Circuit's strongly-phrased admonition concerning the fiduciary duty of debtor's counsel in the *Interwest* case. It is equally cognizant that its independent duty to vet the disinterestedness of counsel trumps even the withdrawal of the objections of the parties in interest. However, the Court also has the discretion

---

[69] KRPC 1.7, 2008 Kan. Ct. R. Annot. 459. Subsection (b) of KRPC 1.7 permits the dual representation if it does not involve the assertion of a claim by one client against the other client in the same litigation, each client consents in writing to the dual representation, the representation is not prohibited by law, and the lawyer reasonably believes that he will be able to provide competent and diligent representation to each client. 2008 Kan. Ct. R. Annot. 460. *But see*, *In re Git-N-Go, Inc.,* 321 B.R. at 60. (Written conflict waivers from the debtor in possession and its holding company owning 87% of debtor's stock, did not eliminate adverse interests and support counsel's employment as debtor's counsel).

[70] *See Interwest Business Equipment, Inc., supra* at 316, *quoting In re McKinney Ranch Assoc.,* 62 B.R. 249 (Bankr. C.D. Cal. 1986); *In re Git-N-Go,* 321 B.R. at 59-60.

-22-

to evaluate whether this dual representation amounts to "an active competition between two interests, in which one interest can only be served at the expense of the other." At this time, it does not.

In so holding, this Court notes that the present facts present many fewer concerns than those in *Interwest* where counsel sought compensation for representing three interrelated debtors with inter-company debt and management contracts. Similarly, this dual representation appears benign when compared to the contemplated representation in *In re Git-N-Go, Inc.* where one firm sought to represent the debtor as well as its parent company that held most of debtor's capital stock and a significant unsecured claim. In addition, the same firm had been intimately involved in a transactions between these entities and among them and their lender. Here, where the Conestoga representation is unrelated to the debtor's effort to reorganize, and in the absence of any other conflicting joint representation by SMH, the Court concludes that SMH is not at this time disqualified under § 327(a) on account of its dealings with Conestoga, at least to the extent that they have been disclosed.

If, however, this Court perceives that a conflict is developing or has developed, SMH's appointment may be terminated and its compensation revisited. Several courts faced with similar circumstances have chosen to "wait and see" whether potential conflicts ripen into actual ones before requiring estates to take the expensive step of being separately represented.[71] Given that the active parties in this case have stated that the underlying issues in this matter will be resolved in an

---

[71] See *In re O.P.M. Leasing Services*, 16 B.R. 932, 936 (Bankr. S.D.N.Y. 1982) (trustee's representation of two related estates in adversary approved on "wait and see" basis); *In re Global Marine, Inc.*, 108 B.R. 998, 1002 (Bankr. S.D. Tex. 1987) (approving representation of multiple related debtors by single firm).

-23-

agreed plan that will shortly be filed, the Court sees little likelihood of an actual conflict developing. The Court and the parties have multiple means to address that eventuality, should it develop.

### III.   SMH as an Involuntary Gap Creditor of the Estate

In its Application, SMH makes no disclosure regarding fees it incurred during the gap period.[72] Section 502(f) provides that claims arising in the ordinary course of the debtor's business after the commencement date but before the order for relief are allowed as though they had arisen before the petition date. Such claims can never be administrative expenses because they are specifically excluded by the language of § 503(b). Yet they are accorded a third priority, junior to that of administrative expenses and domestic support orders by § 507(a)(3). At the evidentiary hearing, SMH disclosed that it incurred some $20,000 in fees on behalf of Debtor in the month of December. Some of these fees were incurred in reviewing and responding to the involuntary petition.[73] These fees were not scheduled on Debtor's Schedules E or F filed January 8, 2009. The question then becomes whether the existence of any SMH gap claim for outstanding fees for the

---

[72] The gap period is the period between the filing of the involuntary petition and the entry of the order for relief. *In re Geothermal Resources Intern., Inc.,* 93 F.3d 648, 651 n. 1 (9th Cir. 1996). *See also, In re EWC, Inc.*, 138 B.R. 276, 279-80 (Bankr. W.D. Okla. 1992) (Counsel who failed to disclose his pre-petition representation and receipt of fees of debtor and sole shareholder violated disclosure requirements of Fed. R. Bankr. P. 2014(a) and alone warranted disqualification of professional and denial of compensation); *In re Cook*, 223 B.R. 782, 790 (10th Cir. BAP 1998) (Rule 2014(a)'s disclosure requirements, which enforce the disinterestedness requirement, are not discretionary)

[73] Allowing these fees as a gap claim would require a finding that they were incurred in the "ordinary course" of this business. *See In re Hanson Industries, Inc.*, 90 B.R. 405, 414 (Bankr. D. Minn. 1988) (Defunct debtors' attorneys fees incurred in defending involuntary proceeding not "gap" claims as not in "ordinary course"). For the present purpose, the Court assumes that SMH's fees support a gap claim.

-24-

month of December precludes SMH's employment as bankruptcy counsel for Debtor.[74]

By definition, a creditor cannot be a "disinterested person."[75]  A creditor is defined as a person who "has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."[76]  Here, BVI petitioned for involuntary bankruptcy on December 1, 2008.  Debtor's motion to convert to a voluntary chapter 11 reorganization was granted December 23, 2008.  The order for relief was effectively entered December 23, 2008.[77]  To the extent SMH's December fees make SMH an involuntary gap creditor under § 502, SMH is not disinterested as required for employment under § 327(a).[78]  SMH can only cure this deficiency by amending or clarifying its disclosure concerning these fees and waiving any claim against the estate for compensation for services rendered between December 1, 2008 and December 23, 2008.  Otherwise,

_____

[74] SMH's omission of these gap fees from its Application is troubling.  This Court would be justified in denying SMH's Application on the basis of this non-disclosure alone, if it were so inclined. *See In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) (There must be strict compliance with the disclosure requirements; violation of the disclosure rules alone is sufficient to disqualify a professional and deny compensation.).

[75] 11 U.S.C. § 101(14)(A).

[76] 11 U.S.C. § 101(10)(A).  *See also,* 11 U.S.C. § 101(5), defining a "claim."

[77] *See* Dkt. 7.

[78] *See U.S. Trustee v. Price Waterhouse*, 19 F.3d 138 (3rd Cir. 1994) (Chapter 11 debtors in possession could not employ as accountant and financial advisor the accounting firm that had performed prepetition services for debtor and for which debtor owed over $800,000; accounting firm was not disinterested); *In re Roberts*, 75 B.R. 402 (D. Utah 1987) (a law firm which is a pre-petition creditor does not meet the disinterested criteria); *In re Estes*, 57 B.R. 158 (Bankr. N.D. Ala. 1986) (law firm was not disinterested and the court's approval of law firm's application for employment in chapter 11 was revoked upon discovery of law firm's pre-pepetion debt owed by debtor).  *See also* 11 U.S.C. § 1107(b) which states: "Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

-25-

SMH must be disqualified as a creditor.[79]

      IV.    Nunc pro tunc Employment of SMH

The Court will deny SMH's request that its employment be approved retroactively to December 1, 2008, the date of the involuntary petition. First, the Court has determined above that SMH cannot receive and must waive its claim to fees for the gap period in order to be deemed disinterested. Second, as to the period from December 23, 2008 to January 15, 2009, SMH has made no showing of the "extraordinary circumstances" necessary to support a nunc pro tunc appointment.[80] Here, SMH received a $10,000 retainer on December 22, 2008, the day it filed the conversion papers. There is no evidence or suggestion that it made an effort to timely file the Application that was thwarted by some intervening cause. Nor is there a suggestion of excusable neglect. There is no doubt that the firm worked diligently for the debtor during this period and the Court recognizes that sometimes the winter holidays upset a law firm's workflow. At the same time, nothing prevented SMH from filing an Application immediately after the new year or, if its employment arrangement with Debtor were somehow in doubt, requesting an interim appointment to protect its interests. In the absence of any extraordinary circumstances, the Court may only allow the appointment effective the date of SMH's Application, or January 15, 2009.

---

[79] *See In re EWC, Inc.,* 138 B.R. 276, 281 (Bankr. W.D. Okla. 1992) (Bankruptcy court does not have the discretionary authority to allow employment of a professional who does not meet the statutory eligibility criteria; such employment is void ab initio); *In re Albrecht,* 245 B.R. 666 (10th Cir. BAP 2000), *aff'd* 233 F.3d 1258 (10th Cir. 2000) (A professional's lack of disinterestedness is a mandatory ground for denial of his or her employment); *In re Interwest Business Equipment, Inc.,* 23 F.3d at 316 (The requirements of § 327(a) are threshold requirements to be met.)

[80] *See In re Land*, 943 F.2d 1265, 1267-68 (10th Cir. 1991); *In re Franklin Sav. Corp.*, 181 B.R. 88 (Bankr. D. Kan. 1005); *In re Bartmann*, 320 B.R. 725 (Bankr. N.D. Okla. 2004).

-26-

<u>Conclusion</u>

The Court concludes that in this factual setting and these circumstances, SMH is disinterested and that its delayed application for employment may be approved effective January 15, 2009. The Application for approval of SMH's employment as debtor's bankruptcy counsel is therefore APPROVED, conditioned, however, on SMH's waiver of any claim against the estate for fees it incurred between December 1 and December 23, 2008.

# # #

-27-