**SO ORDERED.**

**SIGNED this 17 day of September, 2009.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BOOT HILL BIOFUELS, LLC | ) | Case No. 08-13128 |
| | ) | Chapter 11 |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

### MEMORANDUM OPINION

The debtor Boot Hill Biofuels, LLC's attorneys, Stinson, Morrison & Hecker ("SMH"), seek this Court's final approval of their attorney fees in the amount of $141,159 and expenses in the approximate amount of $11,166 for the period December 23, 2008 to May 12, 2009.[1] Original

---

[1] Dkt. 91, hereafter "Final Application." The total fees and expenses sought is $152,325. The Final Application incorporates SMH's First Interim Fee Application filed April 28, 2009 for the period January 15, 2009 through April 13, 2009. (Dkt. 75, hereafter "Interim Application.").

-1-

petitioning creditor Biofuel Venture I ("BVI") objects, arguing that the fees are unreasonable and disproportionate to the size and scope of the case.[2] BVI also asserts that SMH is billing too much for the time it expended in defending BVI's objection to SMH's employment retention to the detriment of the estate. Finally, BVI asserts that too much time on the part of non-bankruptcy counsel was charged. The Court has conducted its independent review of the Final Application and time records of SMH. In addition, it has carefully scrutinized the summaries included by BVI with its objections. After careful consideration of the pleadings, the appropriate legal authorities, and the Court's Fee Guidelines,[3] the Court is ready to rule.

I. Jurisdiction

This is a core proceeding over which the Court has subject matter jurisdiction.[4]

II. Factual Background

As the Court has previously concluded, this was a fairly small and simple chapter 11 case that became complicated when a falling out between the debtor and BVI, its principal financier and owner, bubbled up in late 2008. Boot Hill was organized to build an ethanol plant in Western Kansas. As is typical in that business, a substantial down payment to its general contractor was required in order to nail down a construction "slot." To fund this down payment, Boot Hill issued unsecured notes to various "slot-note holders." BVI was one of the largest slot-note holders and is

---

[2] Dkt. 97.

[3] This Court's Fee Guidelines can be accessed via the bankruptcy court's website:
http://www.ksb.uscourts.gov/images/ksb_chambers/REN_FeeGuidelines011102.pdf

[4] Issues relating to a debtor's retention and compensation of bankruptcy counsel pursuant to 11 U.S.C. §§ 327(a) and 330 are core proceedings. *In re Perez*, 389 B.R. 180 (Bankr. D. Colo. 2008); *In re Bressman*, 214 B.R. 131 (Bankr. D. N.J. 1997); *In re Bresnick,* 406 B.R. 582 (Bankr. E.D. N.Y. 2009). *See* 28 U.S.C. §§ 157(b)(1) and (b)(2)(A) and (B) and 1334.

-2-

owed $750,000.[5] BVI, in turn, capitalized its operations by obtaining investments from aliens who sought entry into the United States under a specialized visa program that extends United States residency rights to certain types of immigrant investors ("EB-5 Program").

As set out in the court's previous opinions issued in this case, BVI's relationship with Boot Hill turned sour in 2008 and the parties' dispute culminated in BVI commencing an involuntary petition against Boot Hill on December 1, 2008. Boot Hill, in turn, filed a motion to convert the case to a voluntary chapter 11.[6] On January 15, 2009, SMH filed its application for employment as Boot Hill's bankruptcy counsel pursuant to 11 U.S.C. § 327(a).[7] While there have been extensive business negotiations between Boot Hill and BVI, most of the controversy in this Court has related to the debtor's retention of SMH as its bankruptcy counsel and BVI's several objections to that engagement. The employment dispute necessitated an evidentiary hearing on February 18, 2009. This will be the third opinion or order this Court has issued in this case, all of them directed at SMH's retention or compensation for services in this case.[8] The Court confirmed a joint plan of reorganization on May 1, 2009, but BVI reserved the right to object to SMH's final compensation.[9]

---

[5] The slot note holders were the only known creditors of Boot Hill.

[6] Dkt. 3. The Court entered an order on December 23, 2008 granting the motion to convert. Dkt. 5.

[7] Dkt. 21.

[8] The reader of this Memorandum Opinion is referred to this Court's prior rulings for a full understanding of the employment issues and a more detailed recitation of the factual background leading up to this case. *See* Dkt. 45 (Memorandum Opinion approving SMH's application for employment effective January 15, 2009, but conditioning such approval on SMH's waiver of its claim for fees incurred during the gap period, December 1-23, 2008); Dkt. 98 (Order Denying SMH's motion to alter or amend the employment order).

[9] *See* Dkt. 84. Boot Hill and BVI submitted a joint plan of reorganization pursuant to a settlement agreement letter between Boot Hill and all of the slot note holders. *See* Dkt. 54, Ex.

-3-

In any event, under the terms of the settlement agreement between Boot Hill and the slot note holders, BVI agreed to pay SMH's fees allowed by the Court, up to a maximum amount of $110,000.[10]

### III.   The Court's Initial Adjustments to Final Application

At the outset, the Court adjusts SMH's Final Application to adhere to the terms of its Employment Order and to disallow fees and expenses not supported by SMH's billing statements. With these two adjustments totaling $16,173, the Court considers SMH's request for approval of a Final Application in the amount of $136,152, rather than the $152,325 as filed.

#### A.   The Allowable Time Period for Fees and Expenses

In its Employment Order, the Court rejected SMH's request for its employment to be approved retroactively to December 1, 2008, the date of the involuntary petition.[11] The Court further conditioned SMH's employment upon its waiver of gap fees.[12] In its motion to alter or amend the Employment Order, SMH then sought retroactive employment to December 23, 2008, the date of debtor's voluntary conversion to chapter 11 and the order for relief. The Court also rejected this effective date of employment.[13] This Court has held firmly to its approval of SMH's employment effective January 15, 2009, the date of its employment application, and does not alter that

---

1. Under paragraph 1 of that settlement agreement, "all parties reserve[d] the right to object to the allowance of any administrative claim, including objecting to the reasonableness of the amount of the proposed claim."

[10]  Dkt. 54, Ex. 1, ¶ 1.

[11]  Dkt. 45, p. 26.

[12]  Dkt. 45, pp. 24-26.

[13]  Dkt. 98.

-4-

determination now.

In its Final Application, SMH seeks approval of fees and expenses from December 23, 2008 to May 12, 2009, the effective date of the confirmed Plan. The fees and expenses incurred for the pre-application and employment period December 23, 2008 to January 14, 2009 total some $10,020.[14] In accordance with its Employment Order, the Court disallows these fees and expenses. Accordingly, SMH's Final Application is reduced by the sum of $10,020.

### B. The Interim Application Error

For the allowable time period January 15, 2009 to April 13, 2009, SMH seeks approval of fees and expenses totaling approximately $102,298.[15] BVI contends that the billings for this time period, however, support a total of $96,145.[16] The Court has reviewed SMH's statements for the Interim Application attached as Exhibit C and concludes that BVI is correct. The itemized statements support fees in the amount of $93,060.50 and expenses in the amount of $3,084.71 for a total Interim Application of $96,145.21. The amount of the Interim Application (and Final Application) shall therefore be reduced by the additional sum of $6,153.

### IV. The Final Application and Legal Analysis

The Court now turns to the substance of the Final Application, as adjusted, and BVI's several objections. The Court considers the factors listed in § 330(a)(3) in determining the reasonableness of the compensation sought here and SMH's compliance with this Court's Fee Guidelines, keeping

---

[14] Dkt. 91, p. 5. SMH incurred attorney fees of $9,864.50 and expenses of $154.63 for this pre-application and employment period.

[15] *Id.* Attorney fees totaled $97,827.50 and expenses totaled $4,469.81. This is the time period encompassed by the Interim Application filed by SMH on April 28, 2009. *See* Dkt. 75.

[16] Dkt. 97, p.2, ¶ 8.

in mind that SMH, as the party seeking compensation, bears the burden of establishing the reasonableness of its fees.[17] The Court also analyzes SMH's time records to ascertain whether its services were necessary and conferred a benefit on the bankruptcy estate.

BVI first complains that the fees and expenses represent a disproportionately high percentage of the debtor's rather small estate of approximately $500,000. BVI argues that it did most of the legal work associated with drafting and confirming the plan and that SMH abused BVI's guaranty of up to $110,000 in bankruptcy fees by spending too much time on the matter. The case was filed in December of 2008 and, after much wrangling about SMH's retention, Boot Hill and BVI reached a settlement which involved the filing of a joint plan and disclosure statement in April of 2009. BVI's agreement to pay the $110,000 in fees was a part of the compromise agreement that was proposed to the Court on April 9, 2009 and approved as part of the confirmed plan on May 1, 2009.

After a thorough review of the time statements filed here by SMH, the Court concludes that while the cost of this case has been high, SMH's billed fees were necessary and justified. BVI clearly anticipated that substantial fees would be incurred because it agreed to pay $110,000 of them. BVI certainly benefitted from the completion of this case because that served its aim of furthering the Boot Hill project as a means of raising capital from foreign investors in return for their being allowed to enter and remain in this country. Its agreement to pay such a significant amount of the

---

[17] Section 330(a)(1). *See In re Iwasa*, 361 B.R. 162, 166 (Bankr. D. Idaho 2007) (Professional seeking compensation from chapter 11 estate bears burden of proving entitlement to the requested fees, as well as reasonableness of amount of such fees.); *In re Maxine's, Inc.*, 304 B.R. 245, 249 (Bankr. D. Md. 2003) (Burden of proof is always on fee applicant regarding the award of fees in bankruptcy case)**;** *In re Colorado-Ute Elec. Ass'n, Inc.,* 132 B.R. 174, 177 (Bankr. D. Colo. 1991) (same).

-6-

fees in this case evidences that. Apparently there was more at stake here than the debtor's assets and, while comparing fees to the extent of those assets is one measure of the application's appropriateness, it is not the sole metric. In addition, by the time BVI's agreement to pay the fees was approved by the Court, most of the fees complained of here had been incurred.[18] Moreover, under the terms of the settlement agreement and confirmed plan, in exchange for payment of these fees, BVI receives 100% of the membership interest in the reorganized debtor Boot Hill and becomes its owner.[19] Boot Hill (and hence, BVI) retains its 51% membership interest in BH Reddwerks, its tax identification and federal employer identification numbers, and the right to utilize its existing bank accounts. The sole ownership of Boot Hill and the retention of the interest in BH Reddwerks is significant for BVI. BVI will be free to use Boot Hill and/or BH Reddwerks to explore potential projects to satisfy the EB-5 immigration investor program requirements for BVI's members.

The Court views BVI's complaint about the amount of time expended by SMH in procuring and defending its employment with some skepticism. By the Court's rough estimation, attorney fees of approximately $18,190 were incurred relative to SMH's employment application.[20] The Court notes that BVI and SMH worked closely both before and after the case was filed. Furthermore, BVI's strident opposition to SMH's appointment strikes this court as tactical. The Court observes in that regard that after BVI's objections and a contested hearing on SMH's potentially disqualifying

---

[18] The Interim Application, covering the period January 15, 2009 through April 13, 2009 totaled some $93,000 in fees or approximately 74% of the $126,528 total fees sought.

[19] The existing membership interests in Boot Hill are to be canceled and exchanged for non-voting membership interests in a new Boot Hill entity to be formed.

[20] This amount computes to roughly 14% of SMH's total attorney fees.

-7-

conflicts of interest, BVI announced that it would withdraw its opposition to SMH's employment. Unfortunately, once this sort of issue is brought to a bankruptcy judge's attention, the Court has an independent duty to analyze the evidence and applicable law and reach its own conclusions. This Court did that, but, of course, SMH was tasked to defend its position as a result of BVI's passive-aggressive tactics. Then, when SMH sought reconsideration of this Court's conclusion that it could not be employed nunc pro tunc for parts of December and January, BVI filed a "comment" opposing SMH's motion, an action this Court found incongruous with BVI's earlier statement that it agreed to SMH's employment. That SMH expended legal time and resources defending its position in the case can hardly have come as a shock to BVI and this Court sees no reason to deprive SMH of fees it had to expend as a result of BVI's inconsistent actions.

BVI offered no evidentiary predicate for its allegations that SMH charged fees in excess of an acceptable amount. There is, for instance, no evidence of what BVI's fees in this case were. Nor did BVI seek to offer any evidence concerning what the "market" price of a case of comparable nature and complexity might have been. SMH asked to be employed at a range of hourly rates. [21]

---

[21] In its employment application, SMH proposed that its partners bill at an hourly rate between $275-$680 and that its associates bill at an hourly rate between $190-$305. The three primary attorneys who worked on this case are Mr. Hoffman, Mr. Hill, and Mr. Zluticky and SMH's time records indicate these individuals were responsible for the vast majority of the billed fees. Mr. Hoffman's hourly rate of $460 is higher than that charged by similarly qualified bankruptcy lawyers in the Wichita market approved by this Court but is within the range of hourly rates proposed and approved. Mr. Hill, a partner, billed at an hourly rate of $395 and this rate is reasonable. Mr. Zluticky, an associate, billed at an hourly rate of $195 and is at the low end of the hourly rates for SMH associates. The Court recognizes that Tenth Circuit case law suggests that rates in the local area should govern here. *See Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006) (Section 1983 civil rights action). While Wichita hourly rates for chapter 11 debtor work tend not to exceed $300, the Court considers that bankruptcy practice is District-wide or regional in scope and that attorneys from larger municipalities with higher rate structures or differential experience in the field may merit higher rates. In other words, the "local area" is not limited to Wichita. That said, the Court may consider hourly rates in making decisions on

Those rates were not challenged at that time and BVI does not challenge them now. SMH charged those rates here. A considerable amount of those fees were accrued in the negotiation of the compromise and plan, a task that was undoubtedly made more complicated by BVI's pre-petition actions. The Court concludes that what the estate will bear of these fees, approximately $26,152, is not disproportionate.[22] What BVI will bear, $110,000, it agreed to bear in the first instance.

With respect to the second issue, that SMH's fees did not benefit the estate, the Court is satisfied that the forgoing analysis resolves that issue. The Court declines to impose an arbitrary percentage that firms can assess against the estate for procuring and defending their retention, especially in the absence of any evidence upon which to base such a qualitative conclusion.

Finally, BVI complains that SMH should not have so extensively used the time and services of Scot Hill, a business lawyer and a partner in the firm. Mr. Hill represented Boot Hill pre-petition, was deeply involved in Boot Hill's dealings with BVI pre-petition, and testified in support of SMH's retention at the February 18 hearing. BVI essentially argues that SMH's bankruptcy counsel, Messrs. Hoffmann and Zluticky were more than adequately qualified to handle the business law matters that this case presented. It also complains that what Hill charged to travel from Kansas City to Wichita to testify in the retention hearing, amounts to an improper witness fee. The Court declines to reduce his fees either for his business work in this case or for his testimony in the hearing. As noted before, there were ongoing behind-the-scenes negotiations involving Hill and BVI. The complex corporate and debt structure of Boot Hill and its related entities likely required

---

employment as well as fee applications. *See In re Southwest Food Distributors, LLC*, 561 F.3d 1106 (10th Cir. 2009).

[22] $136,152 (Final Application, as adjusted) less $110,000 (Agreed Fees to be paid by BVI) = $26,152.

-9-

the continued resort by the bankruptcy lawyers to Hill. He had a history with the debtor entity and its relationship with BVI and was familiar with ethanol plant construction and the ethanol industry in general.

As noted before, when creditors choose to make law firm retention an issue and do not prevail, they cannot complain about estate counsel's seeking some compensation for time and expenses incurred in defending its position. BVI raised SMH's prior relationships as disqualifying conflicts of interest and then abandoned that position after trial. The Court was obligated to go forward in examining these issues independent of whatever arrangement the parties may have eventually reached. Mr. Hill's testimony was enlightening and important to SMH's case. His time spent in negotiating a settlement and effectuating that settlement through the disclosure statement and plan were eminently reasonable and beneficial.[23] By tactically raising the issues of SMH's disinterestedness and disqualifying conflicts, BVI invited some of this expense.

In conclusion, much of BVI's complaint was invited by its use of the § 327 appointment and § 330 fee application processes as litigation tactics in a bankruptcy case that it commenced by filing an involuntary petition. BVI chose to use the bankruptcy process as a lever to benefit itself and not the creditor body as a whole. It cannot now complain about the expense that its decisions caused the debtor and the estate.

V.   Compliance with Fee Guidelines

In addition to the analysis of SMH's Final Application under § 330, the Court has reviewed

---

[23] The Court observes that there was some "double-billing" between Mr. Hill and Mr. Hoffman in this regard. It appears to the Court, however, that based upon the task descriptions, the number of these instances is minimal and they do in fact appear to distinguish Mr. Hill's expertise in business law matters from pure bankruptcy law.

-10-

the same to assure compliance with its chapter 11 Fee Guidelines.

        A.    <u>Expenses</u>

The expenses advanced by SMH all appear to be compensable items under the Fee Guidelines and reasonable.[24] The Court makes two comments relative to expenses. The photocopy rate charged by SMH is 20¢ per page and is reasonable. For the most part, the Court was able to determine that the dates of voluminous photocopies coincided with the retention hearing (copying exhibits), the filing of the plan, confirmation of the plan and the plan's implementation, or other significant dates in the case. The Court suggests that in the future, counsel identify the nature of the photocopies, particularly when a large number of photocopies are made, or risk having the expense disallowed.[25] A more specific identification of materials sent Federal Express or with a substantial postage expense is similarly helpful.

While Westlaw research is compensable, counsel should identify the specific date of the research and the general subject matter of the research in order for the Court to determine its application to this case, rather than claiming a broad period of time with a single entry and without identification of the matter researched. Again, the Court was able to discern, given the period of time identified and cross-referencing the attorney time entries, that it likely related to this case. Counsel should provide sufficient information and detail in expense entries to give the Court some comfort level that the charges in question pertain solely to this case and are reasonable.

        B.    <u>Fees</u>

In general, the SMH timekeepers have sufficiently identified their activities and tasks and

---

[24] *See* Fee Guidelines, *supra* at ¶ V.F.

[25] *Id.* at ¶ IV.A.7.c.

-11-

the time increment involved in each task as required by the Fee Guidelines.[26] The Court commends Mr. Hill in particular for his detail, consistency, and thoroughness of time entries and allocating time increments to specific tasks for a multiple task time entry. There are, however, some instances of impermissible "batching."[27] Because the number of batched entries are few in comparison to the number of time entries in the case and appear to be reasonable, the Court will depart from its usual practice of temporarily disallowing batched entries until the time is separated. More than enough time and resources have already been devoted to professional fees and retention in this case. The batched entries will be allowed with the cautionary reminder that future fee applications containing batched time entries may be temporarily disallowed.

Although the amount of time billed by paralegals was minimal relative to other SMH timekeepers, the Court believes that an hourly rate of $170 or $135 is neither reasonable nor justified for the tasks performed. Accordingly, timekeepers M. Bell, K. Fortner, and K. Lane's time shall be allowed at the hourly rate of $120. This effects a $759 reduction in the Final Application.

Overall, the services described in SMH's time records were necessary and benefitted the estate.[28] The Court does, however, question the necessity of services related to the EB-5 immigration investor program, as the EB-5 program was utilized by and benefitted BVI. Attorney

---

[26] *Id.* at ¶ IV.A.8.b. and ¶ V.A.

[27] *Id.* at ¶ IV.A.8.b.(5). The Court identified several instances where Mr. Hoffman failed to provide the time increment spent *on each task* within a day's time entry. On the more substantial entries alone, Mr. Hoffman's time totals 41.9 hours of batched time. *See e.g.,* Entries dated 5/7/09, 5/6/09, 4/30/09, 4/29/09, 4/1/09, 3/25/09, 2/18/09, 2/4/09, 1/28/09 and 1/21/09.

[28] *See* § 330(a)(1)(A); *In re Lederman Enterprises, Inc.,* 997 F.2d 1321 (10th Cir. 1993) (whether attorneys' services conferred benefit on bankruptcy estate and were necessary were threshold considerations bearing on attorneys' eligibility for compensation).

Sandler had six time entries related to the EB-5 program.[29] In addition, the description of the two time entries on 2/10/09 appear to be duplicates. The Court disallows the $320 fees for the first listed 2/10/09 entry as being duplicative of the second listed 2/10/09 time entry in the amount of $384. The Court further disallows the remaining fees of $1,248 for these services pertaining to the EB-5 program as being unnecessary.

VI. Conclusion

BVI's objection to SMH's Final Application is therefore OVERRULED in part and SUSTAINED in part. SMH's Final Application, with an initial adjusting deduction of $16,173, totals $136,152 in attorney fees and expenses. As stated in this Order, attorney fees and expenses incurred prior to SMH's application for employment are disallowed, as are claimed fees and expenses in the Interim Application that are unsupported by SMH's attached billing statements. The Final Application is further reduced by the sum of $759 for an appropriate paralegal hourly rate and the sum of $1,568 for disallowed services relating to the EB-5 immigration program. SMH's Final Application in the total amount of $133,825 for attorney fees and expenses is APPROVED.

# # #

---

[29] Time entries dated 2/10/09 (two), 2/11/09, 4/29/09, 5/7/09 and 5/8/09 total 4.9 hours at $320/hour for total fees of $1,568.

-13-

Case 08-13128    Doc# 105    Filed 09/17/09    Page 13 of 13